**WO**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Valenta Franchise LLC, | No. CV-24-03502-PHX-KML |
| Plaintiff, | **ORDER** |
| v. | |
| Innerworks LLC, et al., | |
| Defendants. | |

Plaintiff franchisor Valenta Franchise LLC ("Valenta") formed a franchisor/franchisee relationship with defendant Innerworks LLC ("Innerworks"). Innerworks owner Shanmugam Mukundan and his spouse, Vijayabhanu Mahadevan, executed a personal guaranty binding them to Innerworks's obligations under the franchise agreement. Valenta filed this lawsuit after Mukundan started another company, VaQya, which allegedly became a direct competitor of Valenta. (Doc. 36.) Defendants seek dismissal of all claims. Their motion is granted in part and denied in part.

## I.    Factual Background

Valenta is a technology and business consulting system that "helps mid-size organizations increase profitability via process optimization, digital transformation, digital workforce and learning." (Doc. 36 at 4.) It provides services to customer organizations but also operates as a franchisor, contracting in that capacity with franchisees that use Valenta's collection of products and services to provide "outsourcing, consulting, and digital transformation solutions." (Doc. 36 at 7.) Essentially, as a franchisor, Valenta

provides franchisees a suite of digital systems centered on artificial intelligence and outsourced staffing, which franchisees use to serve customer companies. (Doc. 36 at 7.)

Defendant Mukundan owns Innerworks. (Doc. 36 at 8.) On June 9, 2021, Innerworks agreed to become a Valenta franchisee. (Docs. 36 at 8; 41 at 3.) The Valenta Franchise Agreement ("FA") governed Innerworks's use of the Valenta franchise system, including its trademark and other services. (Doc. 36 at 8.) The FA gave Innerworks a license to use Valenta's information and operate a Valenta franchise for five years, with certain terms for renewal. (Doc. 36 at 8, 12.)

Mukundan signed the FA as the sole owner of Innerworks. (Doc. 36 at 8.) Mukundan and his wife Mahadevan also signed a Franchise Owner and Spouse Agreement and Guaranty acknowledging they were "personally obligated to guarantee Innerworks's obligations to Valenta under the Franchise Agreement." (Doc. 36 at 8.)

The FA includes certain restrictive covenants which primarily prohibit Innerworks (and Mukundan and his wife) from competing with Valenta, diverting business or customers from Valenta, and misusing Valenta's confidential information. (Doc. 36 at 9-10, 12; *see* Doc. 1-2 at 26-27.) In other sections of the FA, defendants agreed the restrictive covenants were reasonable and certain defaults could result in automatic termination of the FA. (Doc. 36 at 10-11.) The Guaranty included similar restrictive covenants. (Doc. 1-2 at 78-79.)

In 2023, Valenta and defendants began discussing a medical billing company Mukundan proposed forming, VaQya. (Doc. 36 at 14.) Valenta alleges defendants said they intended to use VaQya "to gain new Valenta clients" interested in revenue cycle management, who would then use Valenta services. (Doc. 36 at 14.) Valenta provided guidance to defendants and the parties agreed VaQya would be staffed by Valenta-sourced employees. (Doc. 36 at 14.) VaQya itself is not a Valenta franchisee. (Docs. 41 at 5; 46 at 4.)

Valenta alleges VaQya gradually became a direct competitor. By the fall of 2024, VaQya had stopped using Valenta's medical billing resources. (Doc. 36 at 14-15.) VaQya

also stopped using Valenta services to onboard medical billing customers, going from six Valenta-onboarded customers per month as of November 2023 to zero by October 2024. (Doc. 36 at 15.) And VaQya stopped employing Valenta-sourced staff, instead hiring over 30 employees of its own in India and the Philippines. (Doc. 36 at 15-16, 19.) At times, VaQya explicitly diverted customers from Valenta: for example, in March 2024, Mukundan told a prospective client Valenta did not have suitable resources for his medical billing needs and he should use VaQya's services instead. (Doc. 36 at 15-16.)

VaQya is now placing advertisements for medical billing services—including with a trademark Valenta alleges is too similar to its own (Doc. 36 at 25-26)—and offering the same services as Valenta but with a pricing structure that undercuts Valenta's. (Doc. 36 at 17-18.) VaQya is no longer entering leads, deals, or customers into Valenta's system. (Doc. 36 at 18.)

Valenta filed this suit in December 2024. (Doc. 1.) Some of the defendants filed an answer. (Doc. 27.) That prompted the court to enter a scheduling order that requires all discovery to be completed by October 2026. (Doc. 32.) Valenta then filed an amended complaint, which is now the operative complaint. (Doc. 36.) The defendants who originally answered the complaint join in the motion to dismiss and alternatively move for judgment on the pleadings. (Doc. 41 at 2.)

The amended complaint alleges that in October 2025, Mukundan told Valenta he intended to "terminate the FA" and continue operating VaQya as a standalone medical billing company. (Doc. 36 at 19-20.) Innerworks's "Franchise Term" appears set to end on June 9, 2026. (*See* Doc. 1-2 at 5, 49 (describing five-year renewable term beginning June 9, 2021).)

Valenta alleges seven claims, all but two against all defendants:

1. Breach of the FA (against Innerworks, Mukundan, and Mahadevan)[1];
2. Violation of the Defend Trade Secrets Act ("DTSA");

---

[1] Valenta initially brought this claim against all defendants (Doc. 36 at 21) but drops the claim against VaQya in its response (Doc. 46 at 4).

3. Conversion;

4. Unfair Competition;

5. Federal Trademark Infringement in violation of 15 U.S.C. § 1051, *et seq.*;

6. Federal Trademark Infringement, False Designation of Origin, and Unfair Competition, in violation of 15 U.S.C. § 1125(a)(1)(A);

7. Breach of Guaranty (against Mukundan and Mahadevan).

Defendants jointly move to dismiss all claims, or alternatively move for judgment on the pleadings. (Doc. 41 at 2.)

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

Defendants move alternatively for judgment on the pleadings, which entails analysis "substantially identical" to that of a motion to dismiss under Rule 12(b)(6). *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

## III.    Capacity to Sue

Defendants allege that under Fed. R. Civ. P. 17(b)(3) and A.R.S. § 29-3902(A), Valenta is a "foreign LLC" that cannot conduct business in Arizona and therefore "has no capacity to sue in Arizona." (Doc. 41 at 6.) A.R.S. § 29-3902(A) requires foreign LLCs to register with the Arizona Corporation Commission before doing business and suing in the state. Capacity to sue, unlike jurisdiction, need not "be determined at the time of filing." *Norse Straits LLC v. SHM Cabrillo Isle LLC*, No. 3:25-CV-03259-H-BJW, 2026 WL

497405, at *4 (S.D. Cal. Feb. 23, 2026). Corporations may launch lawsuits and later cure a violation of this registration provision. *Lucky Inn LLC v. Northfield Ins. Co.*, No. CV-23-08126-PCT-DLR, 2025 WL 2029261, at *2 (D. Ariz. July 21, 2025). Although defendants argue it is now too late for Valenta to do so (Doc. 41 at 6-7), they provide no authority limiting the cure period, and Valenta has now applied to register with the Arizona Corporation Commission. Valenta must file the registration on the docket once it is granted, but the court will not dismiss the suit on this basis. *See id*.

Relatedly, defendants attempt to construe Valenta's argument that it does not conduct business in Arizona (Doc. 46 at 3) as a concession that it has no protectable interest in the state and cannot suffer harm here (Doc. 51 at 2-3). That is clearly not true. *Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002) (corporations may suffer harm in several locations, including where bad acts occurred and corporation's principal place of business).

### IV.    Claims

#### A.  Allegations against Innerworks

Most of the events Valenta complains of result from the activities of VaQya, the competing business Mukundan created alongside a partner. (Doc. 36 at 13.) The FAC contains no allegations suggesting Innerworks partnered with VaQya, itself misappropriated the trade secrets or the contested confidential information it accessed as a franchisee, unfairly competed outside its capacity as a franchisee, or used any competing trademark. Though one sentence in the complaint could be read as implying Innerworks operated VaQya (Doc. 36 at 2), no facts support that inference and Valenta has not alleged a theory under which Innerworks could be responsible for the other defendants' behavior.

Defendants' motion to dismiss is therefore granted as to all claims against Innerworks except the breach of the FA Agreement.

#### B.  Breach of Franchise Agreement and Guaranty

The FA Agreement includes several restrictive covenants, including non-competition and confidentiality clauses which apply both during and after the franchise term. (Doc. 1-2 at 26-28.) Valenta alleges defendants Innerworks, Mukundan, and

Mahadevan breached the FA's non-competition requirements by operating and diverting clients to VaQya, and breached the FA's confidentiality requirements by misusing Valenta's information to build the company. (Doc. 36 at 21; *see* Doc. 46 at 3.) It is not clear whether Valenta considers the Guaranty Agreement ("Guaranty") to be part of the FA or its own separate agreement. (*Compare* Doc. 36 at 8 (describing the Guaranty as an exhibit to the FA) *with* Doc. 36 at 21, 27 (alleging separate causes of action for breach of the FA and breach of the Guaranty).)

Defendants argue Valenta did not adequately plead a breach, the restrictive covenants are unenforceable, Valenta acquiesced to VaQya's formation, and the Guaranty does not cover restrictive covenants or Mahadevan's behavior. (Doc. 41 at 8-13.) The parties agree Delaware law governs the claims based on a choice-of-law provision in the FA. (Docs. 41 at 7; 46 at 8.) Because VaQya is not a defendant in the breach claims, "defendants" in this section refers only to Innerworks, Mukundan, and Mahadevan.

### 1. Adequacy of Valenta's Pleading Regarding Breach of FA

Under Delaware law, the elements of a breach-of-contract claim are: "1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 140 (Del. Ch. 2003). The plaintiff must plead facts from which the court can reasonably infer a breach of contract occurred. *Iqbal*, 556 U.S. at 679. Valenta has sufficiently alleged Innerworks, Mukundan, and Mahadevan violated the FA's non-compete and confidentiality clauses.

Valenta attached a copy of the FA to its original complaint. (Doc. 1-2.) It alleges the FA's non-compete clause in Article 6 prevents franchisees[2] from operating a "competitive business" (Doc. 36 at 10), which the FA defines as "any business that is the same or similar to a Valenta Business including . . . any business that offers and/or provides services and/or products relating to outsourcing, consulting and Digital transformation solutions" (Doc. 1-2 at 7). It has plausibly alleged VaQya, which "sell[s] . . . identical

---

[2] The FA's restrictions as written generally apply to the franchisee and "Owners and Spouses" (Doc. 1-2 at 27), but Valenta concedes Article 6E regarding post-termination competitive behavior only applies to Innerworks (Doc. 46 at 7).

services" to Valenta (Doc. 36 at 26), may qualify as a competitive business. Valenta also plausibly alleges a breach of the FA's Article 6 confidentiality provisions, which prohibit franchisees (and their owners and owners' spouses) from using confidential Valenta information for reasons other than operating the franchise. (Doc. 1-2 at 26-27.) The FA defines confidential information as encompassing Valenta's methods and data, including the manuals, staffing methods, pricing structures, and customer details Valenta alleges defendants used for VaQya's operation. (Doc. 36 at 18, 21.) Valenta has also alleged damages. (Doc. 36 at 21-22.) The claim is adequately pleaded. *H-M Wexford LLC*, 832 A.2d at 140.

### 2. Enforceability of Restrictive Covenants

Defendants allege the FA's confidentiality restrictions (Doc. 41 at 11) and post-termination non-compete restrictions (Doc. 41 at 9) are overbroad. *See Tristate Courier & Carriage, Inc. v. Berryman*, No. C.A. 20574-NC, 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (among other requirements, restrictive covenants must be reasonable in scope and duration and advance a legitimate economic interest of the enforcing party).

In general, covenants that apply during a franchise agreement may permissibly be broader in scope and more restrictive of conduct than those that apply only after the relationship ends. *See Goddard Sys., Inc. v. Gondal*, No. CV 17-1003-CJB, 2018 WL 1566570, at *26 (D. Del. Mar. 29, 2018) (franchise agreements' non-compete provisions have legitimate purpose even where that restriction extends well past termination date); *Athlete's Foot Mktg. Assocs. v. Zell Inv., Inc.,* No. CIV. A. 00-186, 2000 WL 426186, at *10-11 (W.D. Pa. Feb. 17, 2000) (compiling cases). Under this standard, the covenants restricting defendants' pre-termination competitive behavior appear reasonable. The same is true for the confidentiality restrictions, which seem to be sufficiently related to Valenta's legitimate economic interest in ensuring its confidential information is not used for unauthorized purposes. *Cf. Kodiak Bldg. Partners, LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *11 (Del. Ch. Oct. 6, 2022) (finding confidentiality restriction overbroad because it prevented the defendant from using confidential information even

"for other segments of [plaintiff's] business"). But courts analyze post-termination clauses more stringently: among other issues, non-compete clauses must be careful not to exceed the geographic area where the enforcing party has protectable business interests. *Id.* Valenta's post-termination global restriction on competitive behavior may therefore be overbroad, depending on the scope of its business. *Id.*

But defendants move to dismiss this claim on the basis of allegedly overbroad confidentiality restrictions and *post*-termination competition restrictions. (Doc. 41 at 9-12.) Viewing the allegations in the light most favorable to Valenta, Valenta has pleaded breach of the FA under both pre-termination and post-termination theories. (*See* Doc. 36 at 21 (alleging breach "[d]uring the term" of FA), 11 (discussing clause which automatically terminates FA upon certain conditions that may have occurred here).) And it is not clear factually whether the automatic termination clause kicked in, whether Mukundan has prematurely terminated the agreement (Doc. 36 at 13), or whether the agreement remains in effect until its expiration date of June 9, 2026 (Doc. 1-2 at 5, 49). The fact issues surrounding which clauses of the FA apply impact the resolution of the overbreadth argument and make the issue inappropriate for disposition at the pleading stage. *See Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 937 n.1 (9th Cir. 2011); *Sunder Energy, LLC v. Jackson*, 332 A.3d 472, 495 (Del. 2024). The motion to dismiss the claim alleging breach of the FA is therefore denied.

Meanwhile, Section 4 of the Guaranty contains nearly-identical restrictive covenants that apply to the individual defendants (Doc. 1-2 at 78-79), so the analysis above applies to them, too. Valenta also alleges the individual defendants breached the Guaranty by permitting Innerworks's violative behavior. (Doc. 36 at 27 (Mukundan and Mahadevan breached by "failing to cause Innerworks LLC to perform its obligations").) Defendants' argument Mahadevan is not bound by any agreement therefore fails and the motion to dismiss the claims against her on that basis is denied.

### 3. Acquiescence

Defendants argue that because Valenta knew of and helped with VaQya's

formation, the doctrine of acquiescence bars it from complaining of VaQya's subsequent competitive behavior. (Doc. 41 at 12.)

"[T]he doctrine of acquiescence has been inconsistently applied and has rarely been addressed in a thorough, doctrinally-satisfying manner." *Lehman Bros. Holdings Inc. v. Spanish Broad. Sys., Inc.*, No. CIV.A. 8321-VCG, 2014 WL 718430, at *9 (Del. Ch. Feb. 25, 2014). Generally, it prevents plaintiffs who have stayed knowingly silent during a breach from later complaining of it. *Id*. at *12. A defendant asserting the doctrine must show the plaintiff "has full knowledge of his rights and the material facts"; the plaintiff remains inactive or recognizes the complained-of act; and the defendant believes the act has been approved. *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014); *see Himawan v. Cephalon, Inc.*, No. CV 2018-0075-SG, 2018 WL 6822708, at *11 (Del. Ch. Dec. 28, 2018), *aff'd*, 338 A.3d 1290 (Del. 2025). The doctrine is "particularly fact intensive" and therefore generally not appropriate for resolution on a motion to dismiss. *Himawan*, 2018 WL 6822708, at *11.

The FAC expressly contradicts defendants' claim Valenta had "actual knowledge" of the material facts related to VaQya's business operations. Valenta alleges that VaQya's actions were gradual: only over time did it stop using Valenta employees and services, divert customers, and generally renege on the initial agreement. (Doc. 36 at 14-16.) Valenta also alleges it attempted at least once to put a stop to that behavior rather than remaining silent. (Doc. 36 at 16.) These allegations must be taken as true at this stage, *Iqbal*, 556 U.S. at 678, so factual questions preclude holding that the doctrine of acquiescence applies.

### C. Misappropriation of Trade Secrets

The DTSA requires allegations the plaintiff (1) owns a trade secret, (2) which the defendant misappropriated, (3) and which caused damage to the plaintiff. *ReBath LLC v. HD Sols. LLC*, No. CV-19-04873-PHX-JJT, 2020 WL 7000071, at *2 (D. Ariz. Sept. 18, 2020). The plaintiff must identify the trade secrets at issue. *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164 (9th Cir. 1998). He "need not spell out the details of the trade secret," but must describe its subject matter particularly enough to "separate it from matters

of general knowledge in the trade" and "permit the defendant to ascertain at least the boundaries within which the secret lies." *Alta Devices, Inc. v. LG Elecs., Inc*., 343 F. Supp. 3d 868, 881-82 (N.D. Cal. 2018) (simplified); *see also InteliClear, LLC v. ETC Glob. Holdings, Inc*., 978 F.3d 653, 658 (9th Cir. 2020). The plaintiff must also take steps to protect the trade secret rather than making it "readily ascertainable" to others. *InteliClear*, 978 F.3d at 661.

Defendants argue Valenta has been insufficiently particular in identifying the trade secrets at issue. (Doc. 41 at 14.) Although terms like "knowhow" and "confidential information" are generally not specific enough, they "become sufficiently particularized for purposes of stating a claim where the complaint alleges that these categories of information are contained within specific documents." *Beluca Ventures LLC v. Einride Aktiebolag*, 660 F. Supp. 3d 898, 908 (N.D. Cal. 2023). Here, Valenta points specifically to proprietary information contained within its operating manual. (Docs. 1-2 at 10; 1 at 23.) Even at the summary judgment stage, the plaintiff's "burden is only to identify at least one trade secret with sufficient particularity to create a triable issue." *InteliClear*, 978 F.3d at 659. By identifying trade secrets contained within specific manuals (among other items), Valenta has done so.

Defendants' reply also argues in passing that Valenta made its trade secrets readily ascertainable by sharing them with VaQya "without any safeguards." (Doc. 51 at 7-8.) But Valenta alleges it shared information with defendants "for the sole purpose of operating the franchised business pursuant to the Franchise Agreement" (Doc. 36 at 23), and points to other measures it took to keep the information confidential—for instance, requiring Mukundan and Mahadevan to sign confidentiality agreements (*see* Doc. 1-2 at 26-27). Taking Valenta's allegations as true at this stage, this information was not readily ascertainable such that it cannot qualify as a trade secret. *See United States v. Nosal*, 844 F.3d 1024, 1043-44 (9th Cir. 2016) (information not readily ascertainable where it was "provided on an understanding of confidentiality"), *overruled on other grounds, as recognized by United States v. Sullivan*, 159 F.4th 579, 589 (9th Cir. 2025).

Accordingly, defendants' motion to dismiss this claim is denied.

### D. Conversion

Defendants argue Valenta's conversion claim is not properly pleaded because it only alleges defendants took copies of documents or intangible property. (Docs. 41 at 15; 51 at 9.) Valenta disagrees, arguing the operations manual and other information qualifies as tangible property. (Doc. 46 at 13.)

In Arizona, conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen*, 104 P.3d 193, 203 (Ariz. Ct. App. 2005) (simplified). The doctrine "ordinarily" only applies to tangible personal property or "intangible property that is merged in, or identified with, some document." *Id*. Examples where intangible property merged into a document may constitute a "chattel" include stock certificates and insurance policies. *Id*.

Valenta points to documents such as its operations manual and proprietary materials as property sufficiently tangible to support a conversion claim. (*See* Doc. 46 at 13.) But those materials, like customer lists and other strategic documents, "are not independently valuable as tangible property; rather, . . . their value is derived from the competitive advantage they afford [plaintiff]." *Barton & Assocs. Inc. v. Trainor*, No. CV-20-01560-PHX-SPL, 2020 WL 6081496, at *5 (D. Ariz. Oct. 15, 2020); *see SinglePoint Direct Solar LLC v. Curiel*, No. CV-21-01076-PHX-JAT, 2021 WL 3472744, at *8 (D. Ariz. Aug. 6, 2021). Valenta also did not sufficiently allege defendants exercised control over those documents in a manner "inconsistent with [its] rights" because it appears able to access and control the relevant documents even after the alleged conversion. *See Miller*, 104 P.3d at 196, 203 (no conversion where defendant allegedly stole customer information in part because theft did not prevent plaintiff's use of that information).

Accordingly, the motion to dismiss is granted as to the conversion claim. The court need not reach defendants' argument that it is preempted by the Arizona Uniform Trade Secrets Act ("AUTSA"). *See Orca Commc'ns Unlimited, LLC v. Noder*, 337 P.3d 545, 550

(Ariz. 2014).

### E. Unfair Competition

Defendants argue the unfair competition claim, too, is preempted by the AUTSA because it relies on trade secrets (Doc. 41 at 6). A.R.S. § 44-407(A) (preempting non-AUTSA civil remedies for trade secret misappropriation to the extent those claims are based on trade secrets). It is not. The AUTSA displaces claims based on information that has already been defined as a trade secret under that statute, and courts typically do not find preemption before that determination has taken place. *See id.* at 549-50 (claims based on information that does not or may not qualify as AUTSA "trade secret" are not preempted); *Universal Engraving, Inc. v. Metal Magic, Inc.*, 602 F. App'x 367, 369 (9th Cir. 2015) (same). The motion to dismiss this claim is denied.

### F. Trademark Infringement

Valenta alleges a claim for trademark infringement, but there is a mismatch between the type of claim in the complaint (which alleges defendants are currently using Valenta's trademark for VaQya purposes, including in advertisements) and what the parties argue in their briefing (*i.e.*, that Valenta's trademark and VaQya's mark are confusingly similar). (*Compare* Doc. 36 at 25-26 *with* Docs. 41 at 17; 46 at 15.) The court will focus on the confusion theory both parties briefed, even if it is not clearly alleged in the complaint.

To properly allege trademark infringement, a plaintiff must show "a 'reasonably prudent consumer' in the marketplace is likely to be confused as to the origin of the good or service bearing one of the marks." *Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1129 (9th Cir. 1998). The confusion must "be probable, not simply a possibility." *Murray v. Cable NBC*, 86 F.3d 858, 861 (9th Cir. 1996) (simplified). To determine the likelihood of confusion, the Ninth Circuit uses an eight-factor test examining (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) the degree of care customers are likely to exercise in purchasing the goods; (7) defendants' intent in selecting the mark; and (8) the likelihood of expansion into other markets. *AMF Inc. v.*

- 12 -

*Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). Those factors are applied flexibly and their respective importance depends on the case's context. *Multi Time Mach., Inc. v. Amazon.com, Inc.*, 804 F.3d 930, 936 (9th Cir. 2015) (simplified).

Defendants argue the claim is not properly pleaded because Valenta "has alleged no facts to support an inference" that confusion between the two marks is likely. (Doc. 41 at 17.) Because an assessment of these factors "usually requires a full record, . . . dismissal at the pleading stage is generally disfavored." *Trader Joe's Co. v. Trader Joe's United*, 150 F.4th 1040, 1049 (9th Cir. 2025) (simplified) (compiling cases). But the "[l]ikelihood of confusion can be determined at the pleading stage where the parties have obviously dissimilar marks." *Mintz v. Subaru of Am., Inc.*, 716 F. App'x 618, 620 (9th Cir. 2017) (dismissing trademark infringement claim where marks shared the word "love" and a heart symbol but overall designs were "facially dissimilar").

Valenta alleges it holds a trademark for the logo below in relation to services including business management, technology, and consulting services:



(Doc. 36 at 6-7.) Meanwhile, VaQya uses the logo below for its services:



(Doc. 36 at 13.) The parties dispute whether the marks are similar such that a reasonable consumer may be confused between them. (Docs. 41 at 17; 46 at 15.)

Some of the *Sleekcraft* factors are difficult to weigh at this stage; for instance, there is no evidence of actual confusion by customers or Mukundan's intent in adopting the logo.

- 13 -

*See Sleekcraft Boats*, 599 F.2d at 348. Certain others weigh in Valenta's favor; it sufficiently alleges proximate services and similar marketing channels. (*See* Doc. 46 at 14-16 (describing overlapping customers), 26 (describing identical services).) But the same could likely be said about the logos of any two companies in the same industry. And the customers here are generally sophisticated entities contemplating becoming a franchisee or hiring a company for AI solutions, which are likely to exercise greater care than for less-expensive or one-off purchases. *Id.* at 353. Most important here, though, is that these two logos are "obviously dissimilar," a dispositive problem even at the pleading stage. *See Mintz*, 716 F. App'x at 620. Each logo is essentially just the name of the company, which here have different syllable and letter counts,[3] different capitalization, and different shades of blue. VaQya's mark includes an image of a parrot and the descriptor that it offers a "Medical Billing Solution," while Valenta's includes only its name. A reasonable customer, particularly one exercising a greater level of care in selecting a company for an ongoing business relationship, is not likely to be confused.

VaQya's motion to dismiss this claim is granted. Valenta is granted leave to amend this claim only if any amendment does not rely on these same alleged similarities.

## V.    Conclusion

Valenta has adequately alleged most of its claims and the registration issue does not bar the suit from proceeding. Defendants' motion to dismiss is denied as to all claims except certain claims against Innerworks, the conversion claim, and the trademark claim. Should Valenta choose to amend those claims, it must keep in mind it cannot allege facts which are inconsistent with the complaint now challenged. *See Oregon Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1073 (9th Cir. 2023).

/

/

/

/

---

[3] Valenta inexplicably claims both marks have five letters and two syllables. (Doc. 46 at 16.)

Accordingly,

**IT IS ORDERED** Defendants' Motion to Dismiss (Doc. 41) is granted in part and denied in part. Should Valenta choose to amend, it must do so before June 5, 2026.

**IT IS FURTHER ORDERED** the case management deadlines set in Doc. 32 remain in place.

Dated this 22nd day of May, 2026.

_____
**Honorable Krissa M. Lanham**
**United States District Judge**

- 15 -